## Samuel C. Kanady et al. v. William H. Burk.

*Agreement to hold stock : Default to keep margin good : Waiver.* The testimony tended to show that plaintiff, on April 18, 1868, employed defendants to purchase certain stock, and to hold it until he ordered it sold. That he paid $750 down, and soon after gave his check on the bank for $250 to keep the margin good; that the check was never paid, and the margin was not kept good. That defendants notified plaintiff they would sell if he did not make it good. That defendants, at plaintiffs' request, agreed to hold the stock until the 18th of May, in the morning; that plaintiff then called at one o'clock, at which time defendants insist that they told plaintiff he would sell; that defendants, as insisted by plaintiff, then agreed to wait until plaintiff returned from his dinner at two o'clock. Defendant sold the stock at a loss before plaintiff returned. Plaintiff returned at two o'clock, but made no tender of performance.

The court charged the jury, that if defendant notified plaintiffs, as claimed, and that afterwards they agreed with plaintiff to wait until Monday, and that on Monday at one o'clock, another arrangement was made to wait until after the plaintiff's dinner, that plaintiff was entitled to a reasonable time to make a sufficient deposit, and that two o'clock was such reasonable time.

That, if the original agreement was, as insisted by the defendants, that they might sell if no margin was put up before Monday, the performance of it was waived by the agreement to wait until plaintiff returned from his dinner.

*Held, erroneous.* The question was not one of waiver, but whether a distinct agreement was entered into subsequently to, and which varied the terms of the original contract, and which would preclude defendant from selling except under the new agreement. Assuming the defendant's version of the contract, plaintiff had been in default twice. Defendants had notified him of it, and that they must sell the stock unless he made the margin good. If plaintiff acted in good faith in getting the postponement, it must have been to obtain a further deposit.

This was an agreement then made after plaintiff was in default to delay the sale for a definite period, and to take the risk of plaintiff's ability to protect them from loss.

Assuming that defendants were under obligations to wait until two o'clock, it does not follow that they incurred any liability by making sale earlier, unless some further act was done by plaintiff.

*Heard April 22, 23. Decided April 27.*

Error to Wayne Circuit.

This was an action of assumpsit, brought to recover damages for an alleged breach of a contract to purchase certain shares of stock.    The declaration contained special counts, and the common counts.

Judgment was rendered for plaintiff.

The facts are stated in the opinion.

*L. Barbour,* and *Hoyt Post,* for plaintiff in error.

The court erred in fixing the measure of damages in his instructions to the jury.    The plaintiff below could only recover at all upon one of three hypotheses of fact, viz:

*First.* That the original contract was, as testified to by by plaintiff, viz: "That defendants, for the sum of $750, were to purchase for and on account of plaintiff one hundred shares P. M. stock, and hold the same for him until he should order them to sell."    The testimony tended to prove a breach of such a contract, if made.    The court seems to have adopted the rule applicable to a contract to sell and deliver goods at some future day, certain.    This was error.

There is no just distinction between stock and merchandise in the application of the rule for damage. — *Sedg. on Dam. pp. 294, 310.*

The market value on the day of the breach controls the measure of damages.    The first question to be determined is, when was the contract broken.    A distinction may, perhaps, be made between a contract to deliver a specific article, and one merely to deliver a certain quantity of a given class.    In the former, if the vendor parts with the specified article before the day of delivery, he has broken the contract then and there, and put it beyond his power to peform; but in the latter the contract can only be broken on the day of delivery.

This is a contract to purchase and hold.    This contract is a continuing one, and the sale of the stock was a completed and irreparable breach.    Nothing but a substituted

peformance was thereafter possible. The damages are to be estimated with reference to the state of things existing at the date of the breach, which, in this case, we claim was on the 18th, and not on the 26th.

The plaintiff had notice on the 18th, at two o'clock, an hour before the sale actually occurred, that the order to sell had been sent; and immediately on the receipt of the telegram, at three o'clock, the stock had been sold. He was notified of the fact, and a statement of his account with defendants was sent him.

The contract then set up by plaintiff was broken on the 18th, instead of on the 26th, and the change in price was not the natural or proximate result of the breach of the contract. — *3 Mich. 55.*

In a contract to sell and deliver, the vendor, refusing to perform, retains the goods, and if the market value has risen he has compensation in the enhanced value of the goods. But here the defendants get nothing but their commissions, and whether the stock rises or falls in the market, they neither gain nor lose by it.

We insist, then, that under such a contract, the only risk assumed by the defendants was, that they should sell at the market price, and that the plaintiff should have prompt notice thereof, or that they should make good the deficiency, if any, to the plaintiff.

On the other hand, the plaintiff's duty, upon notice of the sale, was to take all reasonable measures to protect himself from any increase of damage happening from any future changes in price. Any change in price subsequent to his receiving notice of the sale, and after the lapse of a reasonable time in the ordinary course of business to re-purchase the stock, was at his own risk, and not that of the defendants. This, the evidence shows, he could have done, at least, on the 19th. — *Sedg. on Dam.* (*4th Ed.*) *103; Blanchard v. Ely, 21 Wend. 342; Darwin v. Potter, 5 Denio, 306; Miller v. Mariners' Church, 7 Greenl. 55;*

*Hardern v. Dalton,* 1 *Car. and Payne,* 181; *Davis v. Fish,* 1 *Iowa,* 407; *Loker v. Damon,* 17 *Pick.* 284; *Thompson v. Shattuck,* 2 *Met.* 615.

*Second.* That the original contract was as testified to by defendants, and that such contract had not been varied by any subsequent agreement.

On this hypothesis it was conceded that the plaintiff could not recover at all on the special counts, but could recover only, upon the count for money had and received, the sum admitted by defendants, in their plea, to be due him.

*Third.* That the original contract was as testified to by the defendants, but that such contract was either waived by the defendants, or was varied by a subsequent agreement of the parties on the 18th.

On the question of waiver, we insist that the extent to which the testimony tends to show anything resembling a waiver, was that of a voluntary suspension of the defendants' right to sell, from time to time, until the 18th, and that the plaintiff acquired no new rights thereby. And no matter that defendants had theretofore, without consideration, voluntarily failed to exercise the right to sell, in the absence of any valid agreement to continue such temporary suspension of this right, how could that affect their authority to exercise such right on the 18th, when they are no longer willing to suspend it? There was no such waiver, or agreement to waive, as could change the measure of damages.

On the subject of the agreement, at one o'clock, to hold the stock until after dinner, or until two o'clock, we insist that this agreement, if any was made, could only be material if the original contract was as claimed by defendants, and that the measure of damages for a breach of this agreement, would be as suggested by defendants' request to charge. Certainly such an agreement could have no relation whatever to any rule of damages

18 MICH.— T.

KANADY ET AL. *v.* BURK.

based upon the value of the stock on the 26th. There was no tender òr offer to perform by plaintiff after dinner.

There was no consideration for the new agreement.— *Ford v. Adams, 2 Barb. 349.*

If the contract were as defendants claimed, they had the right to sell without notice.

In the instruction upon which the third assignment of error is based, there was error; inasmuch as it presupposes a different contract than the one the plaintiff claimed to have made.

*Moore & Griffin,* for defendant in error.

From the testimony of Taylor, plaintiffs in error had not insisted upon a strict performance of the agreement, as they claimed it.

They might have sold out the stock at once in default of the payment, " in a day or two," of the $250.

In lieu thereof, they accept a check from the defendant in error,

When they ascertained that the check was not good, instead of returning it, and insisting on a further advance of money, they held it, even up to the day of trial.

As May 18th approached, they became more urgent, and finally on that day threatened to sell, unless further advances were actually deposited.

1. If the defendant in error had, at the interview, immediately before dinner, offered an advance of money, it would have been incumbent on plaintiffs in error to have accepted it, and held the stock.

There had been no such breach as would justify them, in refusing so to do.

The agreement to wait until after dinner, was simply a waiver as to time. Under the circumstances, it must be considered a waiver before breach.

In this view it would operate as an equitable estoppel to prevent the strict performance of a contract. — *Note to Foster v. Dawber, 6 Excheq. 854.*

Plaintiff in error extended the time; defendant acting upon such extension, delayed making a further advance, and was ready at the time last fixed. The law will not permit plaintiffs to take advantage of a delay expressly sanctioned by them.

2. Again, admitting that a breach had occurred, it was not necessary that there should be any consideration for the waiver, other than that arising out of the original transaction. — *Fitch v. Woodruff & Beach Iron W. 29 Conn. 82; Hansen v. Kirtley, 11 Iowa, 565; Van Buskirk v. Murden, 22 Ill. 446; M'Pherson v. Neuffer, 11 Rich. (S. C. Law R.) 267; Fox v. Harding, 7 Cush. 516; Emerson v. Cogswell, 16 Maine, 77; Savage Manuf'g Co. v. Armstrong, 17 Id. 34.*

The deposit after dinner was to be accepted as a full performance of the contract.

Evidence of waiver will support an allegation of performance. — *Holmes v. Holmes, 9 N. Y. 525; Moore v. Detroit Locomotive Works, 14 Mich. 266; Boutwell v. O'Keefe, 32 Barb. 434; Holbrook v. Bassett, 5 Bos. 147, 429; Young v. Hunter, 6 N. Y. 203; Carman v. Pultz, 21 N. Y. 547; Moses v. Bierling, 31 Id. 462; Clark v. Meigs, 10 Bosw. 337.*

3. As to the measure of damages, counsel cited — *Shepherd v. Johnson, 2 East, 211; M'Arthur v. Seaforth, 2 Taunt. 263; Downer v. Back, 1 Starkie, 318; Harrison v. Harrison, 1 Car. & P. 412; Greening v. Wilkinson, Id. 625; Archer v. Williams, 2 Car. & Kir. 26; Williams v. Archer, 5 Man., Gr. & Scott, 318; Owen v. Routh, 14 C. B. (5 J. Scott,) 327; Gainsford v. Carroll, 2 Barn. & Cres. 624; Shaw v. Holland, 15 Mees. & Welsby, 155; Cortelyou v. Lansing, 2 Cai. Cas. 200; West v. Wentworth, 3 Cow. 82; Clark v. Pinney, 7 Id. 61;*

*Kortwright v. Buffalo Com. Bank, 20 Wend. 91; Com. B'k of Buffalo v. Kortwright, 22 Id. 348; Davis v. Shields, 24 Id. 322; Smith v. Griffith, 3 Hill, 333; Allen v. Dygert, 3 Id. 593; Blot v. Boiceau, 3 N. Y. 78; Arnold v. Suffolk, 29 Barb. 424; Andrews v. Clarke, 3 Id. 585; Romaine v. Van Allen, 26 N. Y. 309; Scott v. Rogers, 31 Id. 676; Daborick v. Emerie, 12 Cal. 171; Maher v. Riley, 17 Id. 415; Randon v. Barton, 4 Tex. 289; Calvit v. McFadden, 13 Id. 324; Kent v. Ginter, 23 Ind. 1; West v. Pritchard, 19 Conn. 212; The Bank of Montgomery v. Reese, 26 Penn. St. 143.*

In most of the authorities, the principle is based upon the fact of advance payment, and is said to apply equally to merchandise as to stock.

Other authorities make a distinction between stock and merchandize.— *23 Ind. 1, and 26 Penn. St. 143, above cited; Sedgw. on Dam. chap. 10.*

But the argument thus far assumes that the breach occurred on the 18th May.

We think this is not correct.

It is true plaintiffs notified defendant that they had sold his stock.

But it must be remembered that they bought and sold as brokers. Defendant's shares were not at all distinguishable from other shares.

Plaintiffs could have replaced the stock, and defendant would be bound by such action.— *Nourse v. Prime, 4 Johns. Ch. 490; Nourse v. Prime, 7 Id. 69.*

Defendant did nothing to rescind the contract, but insisted that he should abide by it.

This gave plaintiffs a fair opportunity to make it good. The breach did not occur till order was given.— *Leigh v. Patterson, 8 Taunt. 540.*

The plaintiffs had the money of the defendant, and it was their duty to hold until instructions to sell.

They were in the market, and could buy at any time,

and ought to have done so, and thereby been ready to perform the agreement on their part.

COOLEY CH. J.

Burk sued Kanady & Taylor, who were brokers in Detroit, for the breach of a special contract, to purchase and hold for him a hundred shares of Pacific Mail stock. The contract, whatever it was, was not reduced to writing, and Burk sought to prove it by his own evidence, which was as follows:

That on April 18, 1868, Kanady and Taylor agreed with him for the sum of seven hundred and fifty dollars to purchase for him a hundred shares of Pacific Mail Stock, and hold the same until Burk should order them to sell. The agreement was an oral one, and nothing was said about commissions, or interest, or margin, or expenses, but Burk had before that time had dealings with them, as well as with others, in stocks, and supposed he was to be charged with commissions, and that they were to advance the balance of the money to purchase the stock, and charge him legal interest. He paid them the $750, and subsequently they sent him a statement of the purchase of the stock at $9450 or $94\frac{1}{2}$ per share, with a charge of $25 for commissions, adding, at the bottom, "To your credit as margin against the above stock $750." Burk further testified that on May 26, 1868, Pacific Mail stock was at $98, and he then sent his brokers a written order to sell at once, and they replied in writing that the stock was sold at 90 net on the 18th, and statement rendered. This evidence constituted the plaintiff's case.

The defendants, on the other hand, gave evidence tending to show that the agreement was that Burk should pay them, as a margin, ten per cent. of the par value of the stock, $750 to be paid down, and $250 in a day or two;

that he should pay all expenses of the purchase and sale of the stock; that he should keep good in their hands a margin of five per cent. on the par value of the stock; that he should pay them interest at ten per cent. on an amount equal to the par value, less the margin deposited; that he should pay them one-eighth of one per cent. commissions for themselves, and a like sum for their New York brokers, on the purchase, and a like sum to each on the sale; that on these terms they made the purchase by telegraph; that they made repeated demands upon Burk for the $250 he was to pay in a day or two, but failed to obtain the same. and also made repeated demands for more margin on said stock, without result; that on May 6, 1868, Burk gave them his check on a Detroit bank for $250, as additional margin, pursuant to the agreement, but on presentation at the bank, payment for this check was refused, and though they presented it several times afterwards, prior to May 16, 1868, the result was the same, and they never collected or received anything. upon it; that Burk was repeatedly requested to make the check good at the bank, and to put up more margin, and that on Saturday, May 16, 1868, they notified him in writing that it would be impossible for them to carry the stock any longer unless he put up more margin.

They further gave evidence to show that in response to this notification Burk came to their office, and said to them he could not put up any more margin, because he had no more money; that they replied they must have more margin, or they could not carry the stock any longer, but that finally they said, as it was then too late to sell that day, they would hold the stock until the next Monday morning, but that on Monday they would have to sell. On Monday morning they had another interview with Burk, and insisted again on his putting up more margin on said stock, and informed him unless he did so, they would be obliged to sell the stock to protect

themselves from loss; that Burk again expressed his inability to put up more, and on presentation of his check at the bank just before noon of that day, payment was again refused; that the stock was then down to 90¾, and defendants then had in their hands a margin of only about one and three-fourths per cent.; that about one o'clock that day, Burk, on his way to dinner, stepped into their office, and said to defendant, Taylor, in reply to his demand for more margin, "If you must sell, sell; if it goes to 90 sell any way. I wish you would hold it till I get back from dinner;" to which defendant Taylor replied, "I can't hold it; it may be too late to sell to-day. We have held it much longer than we ought to." That Taylor then had his dispatch to New York brokers, ordering a sale, written out and in his hand ready to send; that he said nothing to Burk about this, but told him he was going to sell immediately, and at once on Burk leaving the office, Taylor sent off the telegram to the New York brokers, who made sale of the stock at three o'clock that afternoon, at 90⅛; that on his return from dinner, Burk again came in to inquire about the stock, and Taylor informed him it had been sold, whereupon he replied that they had no right to sell the stock; that he was ready and willing to give more margin, and had made arrangements that morning, at the bank, to make his check good; that his check was good that afternoon, and if the stock went up, he would send them a written order to sell, and sue them for the loss.

They gave further evidence to show that about three o'clock on that day, on receiving a dispatch from the New York brokers, announcing the sale, they sent Burk a statement of account showing due him $174.31, which statement he returned, but subsequently drew from them $125 of this sum.

It is quite apparent that this evidence, on the part of the defendants, tended to establish a very different contract from that sworn to by the plaintiff, at the same

time that it fully justified all that they had done under the contract, if its terms were as they claimed them to be. To rebut the defence, the plaintiff introduced evidence tending to show that the said check of $250 was not given in pursuance of the original agreement, but, at the solicitation of defendants, was afterwards given by him voluntarily, for them to hold as security in case the stock went so low as to exhaust the $750 already in their hands, and without any expectation on his part that the check would be presented for payment, but with the express understanding that it should not be so presented, and that he never knew it had been presented until May 16th; that nothing was said by defendants in their note of May 16th, nor in the interview with them on that day, about selling the stock, but that defendant Taylor promised to hold the stock until Monday morning; that on that morning, Burk was in negotiation for a discount at the First National Bank, and soon after the bank closed, at noon, obtained from the cashier his consent for a discount of $400; that his check for $250 was good at two o'clock on that day; that on coming down from his office to go to dinner at about one o'clock, he stepped into defendant's office, and asked defendant Taylor if there was any further dispatch, to which Taylor replied there was not; that he then said, "Very well, Taylor, will you hold that stock until I get back from dinner?" To which Taylor replied, "Yes, we get no telegram between this and 3 o'clock this afternoon, and I will hold it until you get back from dinner." That Burk said to him, "I wish you would," and went to his dinner; that when he came back from dinner, he said to Taylor, "Well, Terry, any further dispatch from New York?" To which Taylor replied: "No, sir, but I sold your stock." That Burk then said, "Terry, you told me you would wait until I got back from dinner." To which Taylor replied, "Well, I took my chances, and I sold your stock." That Burk then said: "Very well; you

will have to suffer the consequences;" that Burk did not give any order to sell; and that no such conversation as related by defendant, Taylor, occurred at one o'clock on the eighteenth day of May, but that the conversation as here given, was the conversation both before dinner and at two o'clock.

This being the state of the case upon the evidence, the Circuit Judge proceeded to address the jury upon the law, and instructed them, if they should find the original agreement to be as stated by the plaintiff, then the defendants were not entitled to sell the stock, except upon the order of the plaintiff, until the depreciation, the accrued interest and the commissions had exhausted the sum of money deposited.

He further charged them that if they should find that, on Saturday, May 16th, defendants sent plaintiff a note, stating that they would not carry the stock any longer unless a deposit was made, and, in consequence of that, plaintiff saw the defendant, Taylor, and had a conversation with him concerning it, and an agreement was entered into whereby defendants were to wait until Monday, and, on Monday, another arrangement was made by which they were to wait until after dinner, then the plaintiff was entitled to a reasonable time to make the additional deposit, and under the evidence in the case, two o'clock in the afternoon was within such reasonable time.

He further charged them that if the agreement was as stated by defendant, Taylor, the performance of it according to its strict terms was waived by the agreement to hold until after the plaintiff returned from dinner on May 18th, (if the jury believe the latter agreement was made) and defendants were not authorized to sell the stock at the time it was sold.

And the judge refused to charge, as requested by defendants, that if the jury should find that, in the conversation between Burk and Taylor at or about one o'clock in

the afternoon of May 18th, Taylor agreed that defendants should not sell the stock until two o'clock, or until Burk returned from dinner, then such agreement was void for want of consideration.

From this statement of the charge it is evident, we think, that the Circuit Judge misconceived the legal effect of the conversation between Taylor and Burk, assuming it to have been as stated in the evidence of the plaintiff. The Circuit Judge treated the question arising upon it as if it were one of waiver only; whereas, an examination of the case on the theory on which, in respect to that conversation, he put it to the jury, will show that the question involved was not one of waiver, but was whether a distinct agreement was then arrived at between the parties, which varied in important particulars the terms of the original contract, and which would be binding upon the defendants and preclude their selling the stock thereafter, except in accordance with the understanding by the new agreement.

The instructions to the jury in respect to the legal effect of that conversation were given on the theory that they might find the original bargain to be as stated by defendants, and had no application to the case if they found the contrary, as in that event the plaintiff would not have been in default, and there would have been nothing for the defendants to waive. But assuming the bargain to have been as defendants claimed, then there had been a default on the part of the plaintiff, from the time when he had failed to pay the $250 as agreed, and a second default occurred when the stock fell so low that they did not have in their hands a margin equal to five per cent. on the par value of the stock.

Whether, when the stock went down so that the stipulated margin did not remain, the defendants were bound, before selling, to .notify the plaintiff of the fact, and to demand a further deposit; or whether, on the other hand, the plaintiff was bound at his peril to watch the fluctua-

tions of the market, and keep his margin good, we do not feel bound, upon this record, to express an opinion. It clearly appeared in the case that the plaintiff was notified of the fall in the market price, and we think the evidence on both sides shows that defendants were insisting upon their right to a further deposit, and that their note to the plaintiff on May 16th fairly apprised him that they expected to sell, for their own protection, unless he made his margin good. We cannot otherwise understand their communication as stated by the evidence on both sides, and the plaintiff apparently acted on this understanding. In his interview with them on May 16th, he induced them to delay further action until May 18th ; and at one o'clock of that day, according to his statement, he secured a further promise that a sale should not be made for another hour. If this was in good faith on his part, it must have been to make arrangements for a further deposit, as no other purpose is apparent or is suggested.

Now, so far as these promises of defendants related to the past, and went to absolve the plaintiff from any liability for a failure to perform his agreement at any time before the promises were made, there is ground to claim that they might legally operate as a waiver; and had plaintiff afterwards, and before the sale, made good his margin, there could have been no doubt that the waiver would have been effectual to heal any previous breach of the contract. It is not, however, as a waiver of a right of action or of a forfeiture, that the plaintiff relies upon these promises, but he treats them as the foundation of a new right, and the present action is substantially based, not upon a failure of the defendants to perform the original contract, but upon the breach of the new agreement.

The new agreement seems to have been regarded by the plaintiff as one merely waiving strict performance by him ; but in so far as it looked to the future, it was an agreement to give further time, and it needed a consid-

eration to support it. Like any other contract without a consideration, it was mere *nudum pactum*. But it was also something more than an agreement to extend time. Under the original contract defendants had in their hands a remedy for any breach of the agreement, which, under ordinary circumstances, would have been completely effectual in its provision for indemnity. On a falling market they were not obliged to wait until the margin was exhausted, but might sell for their own protection when anything less than five per cent. remained in their hands. This arrangement did not leave them to rely upon the pecuniary responsibility of the party for whom they bought, nor would it leave them to take the risk of the fluctuations of the market unless those fluctuations should prove greater and more rapid than was anticipated by the parties as probable when they made their contract. When, therefore, we are told that the defendants agreed, after the plaintiff had been for some time in default, and after the margin had become nearly exhausted, to delay making sale for any definite period thereafter, however short, we must understand that they agreed also, in effect, to take upon themselves in the meantime the risk of the plaintiff's responsibility being adequate to protect them against any loss consequent upon a further depreciation of the stock.

There is no analogy between this case and that of *Moore v. Detroit Locomotive Works, 14 Mich. 266*, where parties waived a strict compliance with an agreement, and accepted as performance that which fell short in important particulars. In the present case it is not sought to hold a party to an accepted performance, but to bind him by the terms of an alleged promise which looked to performance in the future, and which was based upon no consideration whatever.

But if we thought otherwise on this point, we should still regard the charge of the judge as erroneous. Assum-

ing that the defendants were under obligation to wait until two o'clock before making sale, it will not follow, we think, that they incurred any liability by making sale earlier, unless some further act was done by the plaintiff. Although it is not so stated in express terms, yet, as we have before said, the only legitimate inference is that the time was to be given to enable him to make good his margin, and if he failed to make it good, he has no ground of legal complaint. When he came back at two o'clock, the stock was, in fact, not sold, though the defendants supposed it was, and so informed him. It may be that had he then tendered the proper margin, the sale would have been countermanded. Assuming, however, that he had a right to suppose the sale already made, yet we think we are at liberty to infer from what appears in this record, that it would have been easy for defendants at once to replace the stock by purchase, had plaintiff insisted upon their doing so, and tendered performance on his part; and we cannot assume that they would not have done so had the tender been made. The plaintiff made no such tender. He does, indeed, inform us that at that time his check of $250 had become good, but this was not sufficient to make up the margin to five per cent., nor does it appear that he offered to pay even this. He assumed that the failure of defendants to keep their promise to extend the time for performance had given him a right of action, notwithstanding he had not performed, or offered to perform, within the time as extended. This, clearly, is an erroneous view of the law. The extension was for the purpose of giving him time to perform; and on his own theory of the case, unless the defendants had put it out of their power to keep the agreement on their part, by purchasing, if necessary, and holding for him the amount and kind of stock specified, he has not put them in legal default until he has tendered the proper margin. Instead of a sale of the particular one hundred shares

putting it out of their power to perform, we have a right to infer that it would have been as easy to replace the stock as it would have been to replace a hundred bushels of any ordinary marketable grain.

We think, therefore, that the verdict, which gave the plaintiff the value of the stock on May 26th, should be set aside and a new trial granted.

Some of the exceptions taken on the trial relate to the rule of damages, but these become unimportant, unless the jury, on a new trial, should sustain the plaintiff's theory of the original contract as stated in his evidence in chief. As, however, his rebutting evidence would seem to indicate his understanding that defendants were entitled to a further margin, we do not feel called upon to discuss the rule of damages on this record. And we feel the greater liberty to refrain from such discussion since the contract involved, though perhaps legally binding, is yet separated from clearly illegal wager contracts by distinctions so faint and shadowy, that it cannot entitle the parties to demand from the court any larger share of attention than is absolutely necessary to a settlement of their legal rights as they depend upon the particular record before us.

The other Justices concurred.